Chief Judge Fuux
This appeal poses important and far-reaching questions as to the administration of the New York State Teachers’ Retirement System. More particularly, it concerns the power of the System’s Retirement Board to take certain factors into account in computing and fixing the rates of employers’ contributions.
The petitioners are local school districts which initiated this proceeding, pursuant to article 78 of the CPLR, on behalf of the more than 800 such districts which participate in the system. Their petition, containing five separate counts, challenges as excessive the rates of contribution imposed on them as *218 employers for the fiscal years 1959 through 1965.[1] The respondents attacked the sufficiency of the petition and, in addition, charged that the proceeding was barred by the Statute of Limitations and by laches. The court at Special Term agreed with the defendants on both scores; the Appellate Division, not passing on the merits of the controversy, affirmed the dismissal of the petition on the ground that the proceeding was not timely brought. Since the court has concluded that the board acted within permissible statutory limits in arriving at each of the challenged determinations, we find it unnecessary to consider the respondents’ further contention as to whether the proceeding was time-barred.
At the outset, it will be not only helpful to understand the structure of the Retirement System as established by the Education Law (art. 11) but important to bear in mind that it is the Retirement Board’s primary responsibility to insure that all of the liabilities of the system to its teacher beneficiaries can be met when they accrue.[2]
The Teachers’ Retirement System is actually a congeries of separate funds, under the administration of the Retirement Board (Education Law, § 504, subd. 1; § 508), which are used to provide various benefits for public school teachers throughout the State. Some of these benefits — called annuities — are financed out of the teachers ’ own contributions to an “ Annuity Savings Fund ” (§ 516), while the remainder — termed pension benefits — are paid for by the local school districts. through *219 their contributions to a “ Pension Accumulation Fund. ’,[3] In the present case, we are concerned only with the employers’ contributions and the methods used by the board to compute their amounts.
In accordance with the statutory scheme, the employers’ payments to the Pension Accumulation Fund were made up of three components, namely, a “normal contribution” (§ 517, subd. 2, par. b), a “deficiency contribution” (§ 517, subd. 2, par. c) and a “ special deficiency contribution ” (§ 517, subd. 2, par. c). Each of these was computed at a different rate and designed to achieve a different purpose but, taken together, they were meant to be sufficient to enable the fund to meet all of the obligations imposed upon it — the “total pension liability.” If the amounts collected were insufficient for this purpose, and the fund did not build up sufficient reserves, then, the board would be required to assess the employers directly in the year that the unanticipated and unaccounted for liabilities had to be paid (§ 517, subd. 2, par. d). On the other hand, if the board were to collect more than it needed, then, the excess would eventually be returned to the employing school districts in the form of reduced contribution rates in later years. It should, therefore, be made clear that, in the long run, the overall contributions of the employers will always equal the amount necessary to finance the fund’s liabilities regardless of the outcome of this case.
Each of the five causes of action set out in the petition challenges the board’s assessment of one of the three types of contributions. Before discussing these claims, we deem it desirable to consider the nature of the contributions, how they are computed and the purposes they serve.
The Normal Contribution
The normal contribution is the principal source of revenue for the Pension Accumulation Fund. Its rate of assessment is determined on a “ level percentage ’ ’ basis — that is, the rate is expressed in terms of a percentage of the teachers’ salaries which will, theoretically, remain unchanged from year *220 to year.[4] In actual practice, however, the rate is not. level at all but is constantly adjusted to account for changes in the fund’s liabilities and the inevitable inaccuracies in actuarial estimates of their costs. Although the statute requires that such adjustments be made every five years (§ 508, subd. 5), the board has actually made it. a practice to reassess the rate annually.
Section 517 (subd. 2, par. b) provides for two different methods of determining the liabilities which are to be financed through the normal contribution: a “ first method,” used concurrently with the deficiency contribution, and a “ second method,” to come into effect after the deficiency contribution has ceased.[5] The first method only provides for a limited portion *221 of the fund’s liabilities — the death benefits and retirement pension payments for “ new entrants” (teachers who joined the system after it was established in 1921). The amount collected was, therefore, insufficient to provide (1) for these benefits for teachers who were employed at the inception of the system, denominated “present teachers ”, and (2) for other liabilities of the fund, some of which are discussed below, on account of all teachers over and above their death and retirement benefits. These additional liabilities were to be financed through the deficiency contribution.
The second method, which is to be employed after the termination of the deficiency contribution, was originally intended to be used at a time when the normal contribution would be the sole source of revenue for the Pension Accumulation Fund. The statute provides that the rate is to be computed at a level sufficient to meet the “ total liabilities of the pension fund ” (§ 517, subd. 2, par. b). The second method was utilized for the first time in the fiscal year 1965.
The Deficiency Contribution
Because of the limited nature of the normal contribution as computed under the first method, there existed, from the beginning, an “ amount of the total pension liability on account of all contributors and beneficiaries [which was] not dischargeable by the * * * normal contribution ” (§ 517, subd. 2, par. c). This amount, called the “ deficiency balance ”, was to be provided for through the deficiency contribution. The rate at which this contribution was to be assessed was computed in a manner completely unlike that used for the normal contribution. Instead of striving for a relatively constant percentage of the teachers’ salaries, the deficiency contribution rate was designed to provide, at least, a certain dollar amount of revenue each year until the entire deficiency balance was eliminated.[6]
*222 The termination of the deficiency contribution was governed by section 517 (subd. 2, par. e); that provision reads in this way:
“ The deficiency contribution shall be discontinued as soon as the accumulated reserve in the pension accumulation fund shall equal the present value, as actuarially computed and approved by the retirement board, of the total liability of such fund less the present value, computed on the basis of the normal contribution rate then in force, of the normal contributions to be received on account of teachers who are at that time contributors.”
In other words, the deficiency contribution was to cease and terminate when the normal contribution' and the assets of the fund were sufficient to finance its “ total liabilities ” and the deficiency balance was thereby liquidated.
The Special Deficiency Contribution
When the system was first established in 1921, it was contemplated that all of the liabilities of the fund would be covered either by the normal or the deficiency contribution. In 1956, however, the Legislature enacted an amendment to the statute which substantially increased the pension benefits to be accorded to the teachers (L. 1956, ch. 730). Financing these additional benefits through the methods then provided would have resulted in either a sharp increase in the normal contribution rate or a major extension of the deficiency contribution which, by then, had grown quite high due to the requirements of section 517 (subd. 2, par. d). In order to alleviate this burden, the Legislature created a special deficiency contribution, designed to provide a lower rate by amortizing the additional liability over an extended period of time.
Another large increase in the fund’s liabilities arose from the decision of this court in Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1). In that case, we held that a teacher’s annuity benefits must be determined on the basis of mortality tables in effect when he joined the system, *223 and could not be subsequently decreased.[7] Since the teachers’ own contributions were insufficient to provide these benefits, the burden of this additional liability fell upon the Pension Accumulation Fund. Once again, the Legislature acted to lessen the burden upon the employers by providing that the amount of this new liability could be added to the special deficiency and amortized at the extended rate (L. 1959, ch. Ml, § 2).
The most notable feature of the special deficiency contribution, aside from its low rate, was its limited flexibility and scope. It was used solely to finance the two liabilities just discussed — the added benefits enacted in 1956 and the Birnbaum liability — and, after the initial estimates of the cost of these liabilities, there was no provision for altering the rate in order to account for any inaccuracies in the estimates. The rate was initially fixed at a level which would have amortized the estimated cost of the liabilities over a 30-year period and, once determined, that rate continued to be assessed against the employers without change.
The Petition
As already noted, each of the five causes of action in the petition challenges as excessive the board’s assessment of one or another of the three types of contributions. The first and second counts charge that the board’s continuation of deficiency contributions for the fiscal years 1963 and 1964 was contrary to section 517 (subd. 2, par. e). The third and fourth counts allege that the special deficiency contribution rate set by the board in 1958 exceeded the rate authorized by section 517 (subd. 2, par. c). And the fifth cause of action asserts that the normal contribution rate fixed by the board for 1965 was excessive in that it included components not authorized by section 517 (subd. 2, par. b). Study of each of these claims demonstrates that the challenged determinations were all within the scope of the *224 board’s authority and consistent with the statutory scheme and that, accordingly, no one of the counts states a valid or sufficient cause of action.[8]
The First Cause of Action
As discussed above (supra, p. 221), section 517 (subd. 2, par. e) provides that the deficiency contribution was to terminate when the deficiency balance ■—the value of the liabilities not dischargeable by the normal contribution and the assets on hand in the fund — was eliminated. Based upon the items which had traditionally made up the deficiency balance in previous years, this situation (the termination of the deficiency balance) came about some time during the fiscal year 1963. The petitioners claim that the board, by assessing the full deficiency, had collected a substantial excess which ought to be returned. More specifically, the first cause of action alleges that the deficiency balance at the beginning of 1963 was about $20,000,000 but that the board had collected over $32,000,000 in that year through the deficiency contribution.
Even if we were to accept the petitioners’ hypothesis that an excess was collected in the fiscal year 1963, it is clear that they would not be entitled to its return. As noted in the previous discussion of the deficiency contribution (supra, p. 221, n. 6), the amount to be collected from the employers through the deficiency contribution was in no way dependent upon the amount of the deficiency balance. As long as the deficiency contribution was still in effect, the board was required to assess, in each year, a minimum of 3% more than it collected the preceding year (§ 517, subd. 2, par. d). Thus, not only was it within the board’s power to collect the amount it did in 1963 but, in point of fact, it would have been impermissible for it to have collected less.
Because of the minimum rate requirement, it was virtually inevitable that, in the final year, the deficiency contribution would exceed the amount of the deficiency balance and an excess would be collected. The statute imposes no requirement that the amount of this excess be directly returned to the contrib *225 uting school districts, as the petitioners urge, but, presumably, contemplates that it would be added to the fund’s assets, thereby reducing the amount of the normal contribution. Consequently, even assuming that the deficiency balance had been eliminated during the year 1963 and an excess collected, the petitioners have not established any right to the return of this excess. The first cause of action was, therefore, properly dismissed.
The Second Cause of Action
As stated (supra, p. 224), the deficiency balance, as it had previously been computed, would have been eliminated during the fiscal year 1963. By that year, however, the board had decided that this customary method of computing the deficiency balance failed to take into account a substantial liability of the Pension Accumulation Fund which was not being discharged by the normal contribution — the liability for future interest deficits. If this liability were to be recognized, there would be a substantial increase in the deficiency balance which, the board concluded, justified extending the collection of the deficiency contribution through the fiscal year 1964. The petitioners maintain that the liability for future interest deficits could not properly be considered in the valuation of the deficiency balance and, in the second cause of action, question the validity of the continuation of the deficiency contribution for 1964 and demand the return of the entire amount of such deficiency contribution assessed in that year.
Before this question may be resolved, it is necessary to understand the cause and nature of the interest deficit liability of the Pension Accumulation Fund. Since 1921, when the system was first established, the board has been required to annually credit the accounts of the teachers in each of the system’s funds at a “ regular interest ” rate — defined as 4% for teachers who joined the system prior to July 1, 1948 and 3% for those who joined after that date (§ 501, subd. 9) —even though the actual earnings on the system’s investments were insufficient to provide such interest. Realizing that there would be years in which the system would not be able to pay regular interest out of its investment earnings and that additional payments would have to be made to meet this liability, the statute provided, from the very inception of the system, that the difference between *226 the amount earned and the amount which had to be credited to the teachers’ accounts—namely, the “ interest deficit ”—would be paid for by the employers through the Pension Accumulation Fund (§ 508, subd. 2).[9]
Although the fund’s obligation to pay for interest deficits was clearly a part of its total liability which was not discharge-able out of the normal contribution, nó attempt was made to estimate the cost of this liability in advance, and interest deficit payments were added to the deficiency balance only in the year in which they had to be paid. However, in 1958, after interest deficits had occurred regularly for more than 10 years, the State Insurance Department recommended that the board begin planning for the financing of future interest deficits by adding their estimated cost to the deficiency balance before they accrued. By 1964, when the deficiency balance as it had previously been computed had been fully liquidated, the board was faced with the choice of either adopting the Insurance Department’s recommendation or ceasing to assess any deficiency contribution. The former path was chosen for that year and, accordingly, the deficiency contribution was continued.
The contention that the board was required to ignore the anticipated liability of the fund for interest deficits in computing the deficiency balance is not borne out by the statute; there is simply nothing in the legislation to support such a contention. Although it was true that the primary item which made up the deficiency balance prior to 1964 was the fund’s liability on account of “ present teachers ” — those who had been employed before the system was established in 1921 — there is no substance to the argument that the deficiency contribution was to be confined to meeting this ‘1 initial ” or “ historic ’ ’ purpose. Indeed, the language of the statute points the opposite conclusion. It requires the board to determine the deficiency balance on the basis of the “ total pension liability on account of all contributors and beneficiaries not dischargeable by the # * * normal contribution ” (§ 517, subd. 2, par. c) and states that the contribution is to continue until ‘ ‘ the present value, as actuarially computed and approved by the retirement board, of *227 [such] total liability” is equalled by the fund’s assets and future normal contributions (§ 517, subd. 2, par. e). The use of the words, “ all contributors and beneficiaries”, negates the notion that the deficiency contribution was designed solely to furnish funds for “present teachers,” and the language of section 517 (subd. 2, par. e) unmistakably gives the board the authority to “approve” the computation of liabilities and to adjust the amount of the deficiency balance accordingly.
We can only conclude that the words, “total liability,” as they appear in the statute mean just what they say—“total liability ” — and that the board was acting within the scope of its power when it decided to include the statutory liability for interest deficits in its computation of the deficiency balance. Since, as of 1964, the liability' for interest deficits was not accounted for in the normal contribution and since it was, without question, a liability of the Pension Accumulation Fund, the board was thoroughly justified in adding that liability to its deficiency balance for the fiscal year 1964 and, on that basis, extending the. deficiency contribution into that year.
The Third and Fourth Causes of Action
By their third and fourth causes of action, the petitioners challenge the special deficiency contribution rates which were assessed in each year since 1959 and seek an order directing the board to assess the rate differently in the future. It is urged that the board has failed to comply with the portion of section 517 (subd. 2, par. c), set forth below, which prescribes the method of fixing the rate:
“ The actuary shall determine the annual payment which if made in each fiscal year commencing with the year beginning the first day of July, nineteen hundred fifty-eight, for a period of thirty years will provide for [the] special deficiency and the per centum of the total compensation of all contributors during the preceding school year which is equivalent to such annual payment shall be known as the special deficiency contribution rate.”
When the provision was first enacted, the board used this formula to derive the percentage of teachers’ salaries which, as conditions then stood, would have yielded an annual amount *228 necessary to amortize the special deficiency over a 30-year period. This percentage was raised two years later to compensate for the added Birnbaum liability but, aside from that, the rate has since remained unchanged. Teachers’ salaries, meanwhile, have been constantly rising, and the application of this fixed percentage to a rising payroll has yielded ever growing dollar amounts. By the time this action was brought, the revenue derived from the special deficiency contribution had grown sufficiently to liquidate the entire special deficiency balance in 17 years. The petitioners argue that the rate should have been reduced as salaries increased so as to yield a constant dollar amount.
A fair reading of the statute, however, fails to support the petitioners’ contention. Although the actuary was initially required to determine the rate on the basis of an “ annual payment ” — a dollar amount which would have resulted in a 30-year amortization period — it does not define the contribution rate in terms of such payments but as the percentage of teachers’ salaries “ during the preceding school year ” — that is, during the fiscal year 1958 — which would have yielded that amount. Thus, it was the percentage of salaries which constituted the fixed special deficiency contribution rate and the “ annual payment ’ ’ figure was only a factor to be used in the initial computation of that rate.
In support of their interpretation of the statute, the petitioners rely upon what they consider to be an expression of legislative intent that the special deficiency was to be amortized over 30 years. It is readily apparent, however, that the Legislature was not really concerned with the time period over which the deficiency was to be liquidated. It merely provided a long time factor in order to insure that the rate assessed would not be unduly high so as to avoid imposing an undue burden upon the school districts. If, in later years, the special deficiency could be amortized in a shorter period of time without necessitating an increase of the original low rate, this would be all to the good and hardly inconsistent with the legislative purpose.
The Fifth Cause of Action
The fifth count relates to the board’s assessment of the normal contribution rate in the fiscal year 1965. The level of the normal *229 contribution rate is directly dependent on the value of the liabilities which must be financed through it, and the petitioners attack the board’s inclusion, in its estimate of these liabilities, of (1) a reserve against interest deficits (based on the assumption that the system’s earnings would average 3%% per year); (2) a reserve against future actuarial losses (an amount computed on the basis of a one-year setback in mortality tables); and (3) the “ Death-Gamble ” liability (based upon an assumption that it would be extended beyond July 1, 1965).
The challenged items were incorporated into the normal contribution formula at the board’s meeting of March 19, 1964, when it was decided to cease collecting the deficiency contribution and to switch to the ‘ ‘ second method ’ ’ of determining the normal contribution rate, that is, the method based upon the “ total liabilities of the pension fund ” (supra, pp. 220-221). It is our conclusion that the term, “ total liabilities,” is broad enough to encompass each of the items contested by the petitioners.

(1) Reserve against future interest deficits

As already indicated (supra, p. 226), the board originally decided, in 1964, to accept the - Insurance Department’s recommendations and to finance its prospective interest deficit liabilities through an extension of the deficiency contribution. The following year, however, it was determined that, in view of the high level of the deficiency contribution rate, this procedure placed an unnecessary burden upon the school districts and that it would be equally sound, and less expensive, for the board to finance this liability out of the normal contribution.[10]
In order to place a definite value on the fund’s liability for future interest deficits, the board, on the basis of past experience, estimated that the system’s future earnings would average 3%%. As a result, the annual cost of the interest deficit liability would approximate %% of the amount in the accounts of the *230 pre-1948 teachers. The petitioners contend that it was improper for the hoard to assume that such an interest deficit liability would occur and to include it in the valuation of the total liabilities used to determine the normal contribution rate — pointing, in support of that argument, to the statutory requirement that the normal contribution rate be computed “ on the basis of regular interest ” (§ 517, subd. 2, par. b). In making this contention, the petitioners have confused the determination of the contribution rate, necessary to finance the various liabilities, with the board’s estimate of the amount of the liabilities themselves. Section 517 (subd. 2, par. b) merely provides a method, after the fund’s liabilities are determined, of financing them on a level percentage basis. It does not limit the board in its determination as to which liabilities are, or are not, to be financed through this method, or how much those liabilities will be.
Of course, the “ regular interest ” rate is a factor which must be taken into account by the board in determining the amount that the fund, will have to pay for interest deficits in any given year and, in that sense, it could be said that the reserve against future interest deficits was computed “ on the basis of regular interest ’ ’. However, what is more significant, the board — after estimating that the interest deficit liability would be approximately %% per annum to the accounts of the pre-1948 teachers —■ determined the present value of such interest deficits (i.e., the interest deficit liability) and otherwise applied the usual normal contribution formula, including its “ regular interest ” earnings assumption, to determine the level percentage rate necessary to finance this liability (see supra, p. 220, n. 4). Thus, the procedure followed was fully consistent with the provisions of section 517 (subd. 2, par. b), and there is no warrant for the claim that the board violated any of the provisions of the statute.

(2) Reserve against future actuarial losses

Actuarial tables are, by their very nature, only estimates and, to the extent that such tables underestimate the longevity of the system’s teachers, the amount needed to finance their pension benefits will also be understated. The losses to the fund resulting from underestimation of longevity—which proved to be a consistent characteristic of the board’s actuarial tables — were called “ experience ” or “ actuarial” losses. In deter *231 mining the normal contribution rate for the fiscal year 1965, the board included, in its estimate of total liabilities, an amount designed to anticipate and provide for such losses, called the “reserve against future actuarial losses”.[11] The petitioners do not argue that the board cannot try to minimize actuarial losses but they take the position that the method followed was improper. The only method available to the board, they insist, is for it “ formally ” to adopt new tables whenever a discrepancy develops between its estimates and actual experience.
Certainly, the board has full power to adopt such new tables but there is nothing in the statute which prescribes that this should be the sole method of dealing with the problem of actuarial losses. On the contrary, if the board may adopt new tables, there is no reason to assume that it may not take steps to improve the result which it obtains from its old tables. From the standpoint of the school districts, their rate increase would be the same whether it was caused by the establishment of a reserve for actuarial losses or newly adopted tables reflecting increased life expectancy; the districts were not adversely affected by the method chosen. In fact, the use of the reserve method avoided the substantial expense involved in altering and adjusting all of the various actuarial tables individually in each year and (by reason thereof) very likely resulted in lower employer contributions to the expense fund.

(3) The “Death-Gamble” liability

In 1963, the Legislature énacted a new benefit, the “ Death-Gamble ’ ’ benefit, payable out of the Pension Accumulation Fund (§ 512, subd. 3). This provision was initially enacted in 1963 for a single year, although it has been extended every year since then. In computing the normal contribution rate for the fiscal year 1965, the board made the assumption that such extensions would continue to take place indefinitely and computed the amount of the liability as though it were a permanent addition to the fund’s obligations. The petitioners contend that this assumption was unwarranted and that the board should have *232 assumed that the “ Death-Gamble ” benefit would cease to apply after Jane 30, 1965. The argument lacks force. The board’s recognition of the true nature of this liability as a permanent addition to the fund’s obligations was completely justified, if not required.
Following the enactment of the constitutional provision prohibiting reductions in pension benefits (N. Y. Const., art. V, § 7), it has been customary for the Legislature to enact all new benefits on a year-to-year basis. The purpose of this is to permit the Legislature to subsequently change a provision which turns out to be unworkable. If the legislation were not on a year-to-year basis, it would be constitutionally impermissible to later make a change because of the vested rights acquired by the system’s members. This does not mean, however, that the benefits are intended to be temporary. As a matter of fact, no benefit so enacted has later been discontinued. It would be foolhardy to assume that a benefit such as the “ Death-Gamble ” will be discontinued after a year and to make no provision for the financing of future benefits. Actually, continuation of the “Death-Gamble” benefit is almost as certain as death itself, and the board, conscious of its responsibilities, might well have been derelict in its duty had it not recognized this and taken it into account in determining the normal contribution rate.
Conclusion
Each of the causes of action contained in the petition, in effect, charges the board with acting too conservatively in making its determinations as to the amounts necessary and desirable to maintain the system in a sound financial condition. By its conservatism, the board has assured the thousands of its beneficiaries that it will always have sufficient funds to pay them the benefits to which they are entitled while, at the same time, protecting the contributing school districts against the danger of unreasonably high contributions needed to meet unanticipated liabilities in future years.
Regardless of how we read the provisions relating to the rates of contribution, it is clear that the Education Law does not require the board to disregard the fact that the system’s assets were not earning regular interest or ignore any other factor *233 which might affect the future obligations of the fund. It may well be that the contributions challenged here will turn out to be larger than they need have been to meet all of the fund’s liabilities. This, though, is something which, in the very nature of things, cannot be ascertained at this time. If anything is clear from a reading of this case, it is that the fixing of rates and the making of actuarial predictions is a highly complex process involving many variables and requiring considerable expertise. The immediate benefit which might accrue to the petitioners from the imposition of rigid rules governing the board’s determinations is far outweighed by the potential harm to the Retirement System and its members that would result from restricting the board’s power to make realistic determinations based upon all of the inf ormation available to it.
The order appealed from should be affirmed, without costs.

. The system operates on a fiscal year beginning July 1 and ending June 30. Thus, for example, the fiscal year 1965 began on July 1, 1964.

. We would simply observe at this point that the greatest danger in a system such as this is the underestimation of .those liabilities. If they are fixed at an unrealistically low level, then, the system, unable to build up sufficient reserves over the years, will have to assess its contributors directly in the years when its unanticipated and unaccounted for liabilities become due. In the context of the present case, such emergency assessments would have to come out of the operating expenses of the school districts, resulting in hardship not only to the petitioners but to the children whom they serve since, obviously, less money will be available for other purposes.

. The other funds which make up the system include an “ Annuity Reserve Fund” (§ 517, subd. 1) and a “Pension Reserve Fund” (§ 518). When a teacher retires, his accounts in the Annuity Savings and Pension Accumulation Funds are transferred to the Reserve Funds. There is also an “ Expense Fund,” financed entirely by assessments of the employers (§ 519).

. This is done by computing the present value of the liabilities which are to be financed by the normal contribution and, after deducting the fund’s present assets, dividing such figure by the present value of the teachers’ future salaries.
It is to be noted that, in applying this formula, the liabilities and the future salaries of teachers must be reduced to their “ present values,” that is, the amounts which, if paid today, would be sufficient to pay those items when they become due. In arriving at those present values, the system’s actuary is required to use an earnings assumption computed “on the basis of regular interest ” (§ 517, subd. 2, par. b)—a fixed statutory interest rate (§ 501, subd. 9; see, infra, p. 226). Thus, in order to fix the present value of a liability, the actuary first estimates- its annual cost and then finds the amount which, if deposited today in an account earning regular interest, would yield the required amounts in the years in which they are to be paid.

. Section 517 (subd. 2, par. b) describes the, first method as follows:
“ On the basis of regular interest and of such mortality and other tables as shall be adopted by the retirement board, the actuary * * * shall determine the uniform and constant percentage of the eamable compensation of the average new entrant, who is a contributor, which if contributed * * * throughout his entire period of active service, would be sufficient to provide for the payment of a death benefit payable on his account and to provide at the time of his retirement the total amount of his pension reserve. The rate per centum so obtained shall be known as the ‘ normal contribution ’ rate.” (Emphasis supplied.) The statute then proceeds to outline the “second method ”: “ After the deficiency contribution has ceased to be payable, the normal contribution shall be the rate per centum of the earnable salary of all contributors obtained by deducting from the total liabilities of the pension fund the amount of the funds in hand to the credit of that fund and dividing the remainder by one per centum of the present value of the prospective future salaries of all contributors as computed on the basis of the mortality and service tables adopted by the retirement board and on the basis of regular interest.” (Emphasis supplied.)

. This dollar amount was originally set at 4% of the deficiency balance (§ 517, subd. 2, par. e) but each succeeding annual payment was required to be 3% greater than the preceding one (§ 517, subd. 2, par. d). As a result, in later years, there was no direct relationship between the amount of the deficiency balance and .the deficiency contribution rate, and changes in the former would not affect the annual amount which the board was required to assess.

. Unlike the pension benefits, the amount a teacher would receive as an annuity was not fixed by statute .but was to be determined actuarially on the basis of the amount of his contributions. (Education Law, § 510, subd. 2; see Birnbaum v. New York State Teachers Retirement System, 5 N Y 2d 1, 7, supra.)

. We simply note that the minority herein agrees that three of the counts — the first, third and fourth — fail to state a cause of action and were properly dismissed below.

. Thus, in so many words, section 508 (subd. 2) declared that “Any deficiency in the amount required, to cover the interest requirements of the funds * * * shall be paid from the pension accumulation fund.”

. By 1965, the deficiency contribution rate had grown to 4.29% of the annual payroll of the school districts. In sharp contrast, the cost of financing the interest deficit liability through the normal contribution was less than 1.5%. Consequently, the board’s determination to increase the normal contribution rate for 1965 rather than to continue the deficiency contribution can hardly be said to have adversely affected the school districts.

. The amount of this reserve was estimated by determining the increase in the value of total liabilities which would result from an additional life span of one year for all .teachers.